[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a fully contested custody matter between unmarried parents of a minor child, Sean Nocera, born September 14, 1991. The plaintiff is the mother of the child and the defendant is the father of the child.
Family Services completed a study in this case on November 22, 2000. The court finds that the background information, summary of issues, assessment of the family, and conclusions are all factually accurate and therefore a copy of the Family Relations report is attached to this memorandum and is incorporated by reference except for some of the recommendations which the court will address later in this decision.
The court finds the following additional facts. The plaintiff has not mentally or physically abused the child as alleged by the defendant. The plaintiff is a warm and loving mother to the child. The child is more tense and distracted and nervous in the presence of the defendant. He is more relaxed with the plaintiff when he is alone with her then when the defendant is present. The defendant has involved the child in this custody dispute by having him review the Family Relations report and by CT Page 9522 having him testify in court and to be present in court when he was not testifying. In some phone calls with the child the guardian ad litem could hear the defendant in the background telling the child what to say. The child presently has a deep bond with both the plaintiff and the defendant and loves both parties. Prior to March 15, 2000, the plaintiff and the child had a good open relationship. Between March 15, 2000, and the Summer of 2000, the relationship of the plaintiff and the child was not good with the child having a lot of hostility to the plaintiff. At the present time the plaintiff's relationship with the child was greatly improved. The plaintiff will foster a loving and close relationship between the child and the defendant if she has custody of the child. The plaintiff never purchased a knife for Sean at Dollar Store. The defendant called Sean as a witness and he testified that he wants to live with the defendant. The court has given consideration to the wishes of the child regarding the issue of custody. The defendant claims that the plaintiff struck the child when the parties were at Family Relations. The court finds that that did not occur. The defendant claims that the family relations officer did not tell the truth when testifying in court. The court finds that all of the testimony of the family relations officer was credible. The defendant has faulted Family Relations regarding the interview that the Family Relations officer had with the child. The court finds that the method used by the family relations officer to interview the child was totally appropriate. When testifying in court the child referred to the plaintiff as "Michelle". He would refer to the plaintiff as "my mom" when not testifying in court. Contrary to the testimony of the defendant, the guardian ad litem never told Sean that she would have him remain with the defendant or that she would make recommendations based on what Sean wanted. The defendant has called the plaintiff derogatory names in front of the child such as "whore" and "slut". Contrary to the testimony of the defendant, the plaintiff never started to drive her vehicle when the child was only partially in the vehicle. Further she did not operate her vehicle at a high rate of speed when the child was in the vehicle. On March 24, 2000, both the plaintiff and the defendant met with a licensed clinical social worker. The purpose of the meeting was to get the plaintiff and the defendant to better work together for the best interest of the child. The meeting was not successful. The defendant verbally attacked the plaintiff and said he was not willing to reach any agreement with her through communication and working together. The plaintiff was willing to work together with the defendant in the best interest of the child.
In discussing the test of the best interest of the child, the court inBlake v. Blake, 207 Conn. 217, 224-25 (1988), stated in part as follows:
 In making a determination of custody . . . the trial court is "bound to consider the child's present best CT Page 9523 interests and not what would have been in her best interests at some previous time." (Emphasis in original.)
The Blake court also cited with approval the case of Yontef v. Yontef,185 Conn. 275, 283, 440 A.2d 899 (1981). The Yontef court held in part as follows:
 The test is not which parent was the better custodian in the past but which is the better custodian now. See, e.g., Trunik v. Trunik, 179 Conn. 287, 290, 426 A.2d 274 (1979); Spicer v. Spicer, supra, 164; Simons v. Simons, supra, 350; so also have we rejected any presumption that a parent's life style necessarily has an adverse effect on a child. Gallo v. Gallo, 184 Conn. 36, 42, 440 A.2d 782 (1981). In the exercise of its awesome responsibility to find the most salutary custodial arrangement for the children of divorce, the court must however take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being. Seymour v. Seymour, supra, 711.
The recommendation of family services was as follows:
 1. Both parents share a joint custodial arrangement for the child.
2. Primary physical residence should be with the mother.
 3. Father should have reasonable rights of visitation with the child every other weekend from Friday 3:30 p.m., where father should pickup the child after school until Sunday 7:30 p.m., where mother should pickup the child at father's house.
 4. Father should have reasonable rights of visitation with the child, every Tuesday and Thursday from 3:30 p.m., where father should pickup the child after school and mother should pickup the child at father's house at 7:30 p.m.
 5. Both parents advise and consult each other regarding CT Page 9524 the major developmental and elective decisions concerning the child's medical, education, and religion, etc. If the parents are unable to reach an agreement, then mother should make the final decision.
 6. The holidays should be alternated yearly with Christmas Eve, 12/24/00 beginning with father and Christmas Day, 12/25/00 beginning with mother.
 7. Both parents should have two weeks of uninterrupted vacation with the child during the summer months.
 8. Mother's Day and Father's Day should be spent with the respective parent.
 9. The family should continue with family counseling on a regular schedule so as to monitor their adjustment to the situation.
 10. Both parents should be involved in parenting education classes.
 11. The child should not be relocated from the state by either parent without ninety (90) day prior notice to the court.
The court enters the following orders:
 ORDERS
1. Both parents share a joint custodial arrangement for the child.
2. Primary physical residence should be with the mother.
3. Father should have reasonable rights of visitation with the child every other weekend from Friday 3:30 p.m., where father should pickup the child after school until Sunday 7:30 p.m., where mother should pickup the child at father's house.
The court is not granting the defendant visitation with the child every Tuesday and Thursday from 3:00 p.m. due to his refusal to pickup the child after school.
4. Both parents are ordered to advise and consult each other regarding the major developmental and elective decisions concerning the child's medical, education, and religion. If the parents are unable to reach an CT Page 9525 agreement, then mother should make the final decision.
5. The holidays should be alternated yearly with Christmas Eve, 12/24/00 beginning with father and Christmas Day, 12/25/00 beginning with mother.
6. Both parents should have two weeks of uninterrupted vacation with the child during the summer months starting with the Summer of 2002. The two weeks of uninterrupted vacation do not have to be consecutive. Each party is to give to the other party at least thirty (30) days advanced written notice by registered mail/return receipt or certified mail/return receipt of the weekly Summer uninterrupted vacation elected by that party.
7. Mother's Day and Father's Day should be spent with the respective parent.
8. The child should not be relocated from the state by either parent without ninety (90) day prior notice to the court and without court approval.
9. The court reserves decision on the issue of payment of guardian ad litem fees for a future hearing.
10. This order is to be effective July 14, 2001.
AXELROD, J.
 Judicial Branch Court Support Services Division Superior Court — Family Division Custody/Visitation Evaluation Report _____ Mediation Report
Superior Court Docket Number F.S.U. Number Waterbury 158577 J.D. — 3572
Plaintiff: _Michelle Hebert________ Atty. For Plaintiff: _Pro Se___________
vs.
Defendant: _Joseph Nocera__________ Atty. For Defendant: _Pro Se___________
Children: Sean Nocera (dob 9/14/91) Atty. For Children: _D. Susanne Snearly
CT Page 9526 _________________________________ _________________________________ _________________________________
 Requested by the Honorable: _Barry K. Stevens____________ (Judge of the Superior Court)
Referral Date: _5/15/00____ Continuance Date(s): ________________ ________ Completion Date: _11/22/00____ Submitted by: _Naomi Marinaro________________ (Family Relations Counselor(s))
 Recommendations/Agreements: Please see attached.
WATERBURY SUPERIOR COURTCSSD — FAMILY SERVICES
EVALUATION CONTACT SHEETCASE NAME: MICHELLE HEBERT VS. JOSEPH NOCERA DN 158577 JD 3572Case referral date: 5/15/00Assignment date: 5/23/00
CONTACTS: DATE TIME/TYPE
Michelle Hebert 5/26/00 Appointment letter 6/05/00 Telephone contact 6/07/00 Office interview 6/09/00 Telephone contact 6/12/00 Office interview 6/15/00 Telephone contact 6/20/00 Telephone contact 6/26/00 Telephone contact 7/05/00 Telephone contact 7/07/00 Telephone contact 7/14/00 Telephone contact 8/01/00 Home visit 8/08/00 Telephone contact 8/08/00 Sent referral list 8/14/00 Telephone contact 8/14/00 Office interview 8/17/00 Telephone contact 8/18/00 Telephone contact 8/22/00 Telephone contact 8/24/00 Letter received CT Page 9527 8/30/00 Telephone contact 8/31/00 Telephone contact 9/06/00 Telephone contact 9/18/00 Telephone contact 9/21/00 Mailed release form 9/26/00 Telephone contact 9/28/00 Telephone contact (from) 10/25/00 Telephone contact (from) 11/22/00 Telephone contact (from)
Joseph Nocera 5/26/00 Appointment letter 6/05/00 Telephone contact 6/07/00 Office interview 6/13/00 Telephone contact — n/a 6/15/00 Telephone contact — n/a 6/16/00 Telephone contact — n/a 6/16/00 Letter 6/16/00 Telephone contact 6/20/00 Telephone contact 6/21/00 Office interview 6/26/00 Telephone contact 6/28/00 Home visit 7/24/00 Telephone contact — n/a 7/25/00 Telephone contact — n/a 7/31/00 Telephone contact — n/a 8/03/00 Telephone contact — n/a 8/04/00 Letter 8/09/00 Telephone contact 8/09/00 Telephone contact 8/10/00 Telephone contact 8/10/00 Referral list mailed 8/16/00 Office interview 8/18/00 Telephone contact 8/21/00 Telephone contact 8/23/00 Telephone contact 9/07/00 Telephone contact 9/21/00 Signed release
COLLATERAL CONTACTS
Dept of Children and Families 6/12/00 Mother signed release 6/21/00 Father signed release 7/11/00 Telephone contact 8/02/00 Telephone contact 8/04/00 Telephone contact 8/09/00 Received records CT Page 9528 8/11/00 Telephone contact 8/17/00 Telephone contact 8/22/00 Telephone contact 9/06/00 Telephone contact 9/07/00 Telephone contact 9/21/00 Telephone contact 9/25/00 Telephone contact 9/27/00 Received records
Regan School (Mr. Mitchell) 6/07/00 Mother signed release Principal: Ms. Frageau 6/21/00 Father signed release Kevin Mitchell/teacher 99/00 6/28/00 Received report card Louise Mancini/psych. 7/20/00 Telephone contact Dale Smith/teacher 00-01 7/27/00 Telephone contact 9/01/00 Telephone contact 9/07/00 Received letter 9/25/00 Telephone contact 9/27/00 Telephone contact (from) 10/04/00 Telephone contact 10/10/00 Telephone contact (from) 10/11/00 Telephone contact
Ms. Florentine Thomas 6/21/00 Mother signed release (child's pediatrician) 6/21/00 Father signed release 6/26/00 Received records
Henry Schissler, M.S. 6/21/00 Father signed release 7/04/00 Release returned/wrong address 7/05/00 Mother signed release 7/14/00 Telephone contact 7/26/00 Telephone contact
Family Intervention Center 9/11/00 Telephone contact Joseph Futschik 9/20/00 Telephone contact 9/29/00 Mailed releases 10/04/00 Telephone contact 10/11/00 Telephone contact 10/25/00 Telephone contact 10/26/00 Received letter
GAL for Sean: D. Susanne Snearly 10/02/00 Office visit
PERSONAL REFERENCES
CT Page 9529
Mother: Dennis O'Heron 6/12/00 Sent letter 6/23/00 Received letter
Linda Sportbert 6/12/00 Sent letter 6/26/00 Received letter
Father: James Murray 8/17/00 Sent letter 9/15/00 Telephone contact (from)
Salvatore Russo 8/17/00 Sent letter 9/13/00 Telephone contact (from)
Theodore/Mary Goumy 8/17/00 Sent letter
 Michelle Hebert vs. Joseph Nocera D.N. 158577 J.D. — 3572
BACKGROUND INFORMATION
On May 15, 2000 in the Waterbury Superior Court, this matter was referred to the Family Services unit for the purpose of a custody evaluation. This is a matter involving Michelle Hebert and Joseph Nocera. The couple met in July 1986 and never married. They have one minor child, Sean Curtis Nocera, (dob 9/14/91).
The relationship ended in June 1999 and they cohabited until March 2000, when Ms. Hebert left the family dwelling and the child remained with Mr. Nocera. A stipulated agreement was entered on May 15, 2000, allowing Ms. Hebert visitation every other weekend from Friday after work to Sunday 8:00 p.m. and two days per week after work to 9:00 p.m. However, the visitation was inconsistent and Ms. Hebert filed a motion for contempt on June 13, 2000.
On July 17, 2000 the court appointed a guardian ad litem for the minor child, ordered the family to participate in counseling, and for Mr. Nocera to encourage Sean to visit with his mother. However, visitation was again inconsistent. Ms. Hebert stated she made several attempts to see her son with police intervention. Since the case has returned to court on September 18, 2000, Ms. Hebert stated she has been seeing Sean on the scheduled visitation times and they have been rebuilding their relationship. On October 10, 2000, a stipulated agreement was ordered stating the parents would continue with family counseling and the visitation schedule would remain the same during the pendency of the CT Page 9530 custody evaluation.
Michelle Hebert resides in a two-bedroom trailer home located in Prospect, Connecticut. She purchased the home in March 2000, which is located in a residential area. According to Ms. Hebert, she is in the process of setting up Sean's bedroom. Ms. Hebert is employed with Intramagnetics General Corporation as a manufacturing specialist since August 1987. Although she was working second shift and then third shift for several years, she recently changed her work hours to Monday through Friday from 7:00 a.m. to 5:00 p.m.
Joseph Nocera resides in Waterbury, Connecticut. Mr. Nocera purchased the family dwelling from Ms. Hebert on February 25, 2000. The four-bedroom home is located in a residential neighborhood. Sean is currently residing with him. Mr. Nocera is a self-employed day trader since January 1999, and works out of the family dwelling. Previously, he was employed with Mercury Fuel Oil from December 1996 to 1998.
SUMMARY OF ISSUES
Ms. Hebert is requesting joint legal custody and primary physical residence. Her main concern is her lost relationship with Sean. Ms. Hebert stated that Mr. Nocera has undermined her ability to share a positive relationship with him. She reported there have been numerous past incidents of domestic violence that the child has witnessed in the home, and is concerned that he is currently subjected to his father's emotional abuse. Ms. Hebert stated Sean has alliances with his father because of Mr. Nocera's manipulation.
Ms. Hebert is concerned with Mr. Nocera's inability to appropriately care for their child, as well as providing a structured environment for him. She indicated Mr. Nocera has alienated Sean from visiting with her and continues to speak negatively about her in his presence. She believes Mr. Nocera is responsible for the alienation from her, which has caused Sean to act out against her. Mr. Nocera, on the other hand, stated he has always been the primary provider for Sean, and has assumed responsibility for the household functions. He stated that Ms. Hebert lacked responsibility and was often absent from the home which has had a profound effect on Sean. He believes that mother's inconsistent contact with the child, left him with feelings of being abandoned and emotionally upset. Additionally, Mr. Nocera does not agree with Ms. Hebert's form of discipline, which he views as being physically harmful to Sean.
Both parents continue to blame each other for the lack of parenting involvement and poor communications. Although each claims to want what is best for their child, they agree they are unable to reach any permanent CT Page 9531 co-parenting plans.
ASSESSMENT OF THE FAMILY
Information pertaining to the child's medical care was received from Dr. Florentine Thomas in Naugatuck, Connecticut. The pediatrician indicated the child was last seen on November 3, 1998 for a well visit. Both parents have indicated that mother usually brought the child to the doctor's office for visits.
The Department of Children and Families (DCF) was contacted following the parents' arrest in October 1999. Marilyn Osorio, DCF worker, indicated the case was opened on October 18, 1999 and closed on November 27, 1999. She reported the mother left the relationship and wanted to start over, and the emotional effect of the separation was overwhelming for the father. Ms. Osorio indicated the child was the peacemaker and acting as the parent. She contacted Mr. Henry Schissler, who was the child's therapist during that time. The child was also referred to Dr. Robert Peters, psychiatrist, to be assessed for possible depression and the need for medication, though she was unaware if he was on medication during that time. Ms. Osorio stated that Mr. Nocera reported bruises on the child's face because the mother would squeeze his cheeks to get his attention. DCF was unable to substantiate any physical abuse. Although, Ms. Osorio indicated during the home visit, the child would not obey his mother's rules and directives. The conclusion of DCF's report listed substantiation of emotional abuse by both parents. However, a service agreement was signed by both parents for them to cooperate with the court and comply with the protective order.
The Department of Children and Families (DCF) was again contacted on August 7, 2000, due to a risk of injury charge against the father. James Funaro, investigator, indicated that Mr. Nocera left the child unattended at approximately 10:30 p.m. to go to the store for milk, and the police did not arrest father until 11:30 p.m. According to Mr. Funaro, he went to the father's house several times. He indicated his truck was in the driveway, the door was open and he could hear the television. After several attempts by DCF, Mr. Nocera would not answer the door. Mr. Funaro also indicated when he initially interviewed the child, the child showed no signs of physical abuse, nor did he state that his mother or father hit him. On the second home visit, father made allegations that mother physically abuses the child. These comments were made in the presence of the child. When Mr. Funaro interviewed the child, he stated his mother slapped him with an open hand on two occasions. Mr. Funaro also met with Ms. Hebert in her home. DCF substantiated physical neglect that Mr. Nocera left Sean unattended and had him sign a service agreement, which will terminate on December 6, 2000, not to leave the child unattended. CT Page 9532
Upon review of the Department of Children and Family records, father stated that Mr. Schissler referred he and Sean to Robert Peters, psychiatrist with Family Counseling in Cheshire, Connecticut. The records indicated the child may be depressed and in need of medication. However, neither parent followed through with the recommendation. Mr. Henry Schissler, M.S., Director of the Housatonic Community College in Bridgeport, Connecticut was contacted. Mr. Schissler confirmed he has a private practice in Cheshire, Connecticut, where he saw Mr. Nocera and the child on a number of sessions during the later part of 1999. According to Mr. Schissler, the parent's relationship was distressed. Ms. Hebert was spending less time in the house and more time with the new boyfriend, their son's behavior in school was not good and he was failing. During the next session, Mr. Schissler met with the child, who stated he had an "old mom" and he now he has a "new mom" whom was mean and intolerant. He stated he wants his "old mom" back. Mr. Schissler stated the child was receiving messages by the father, which left the child stuck in the middle, powerless, and very confused. He additionally stated father told the therapist, the mother was very severe with discipline and slapped the child in the face. The child reported to the therapist that both parents yelled and slapped him at times. Mr. Schissler believes Mr. Nocera lacked emotional control and was still very much in love with this woman. The therapist reported the child's hygiene was disheveled at times when Mr. Nocera would bring him to his office.
Sean, age nine, presents as an active and preoccupied child. He was observed and interviewed on two occasions. It was clear from these interviews Sean has a lot on his mind and keeps active to avoid the family issues. He interacted very little with either parent and tended to keep himself preoccupied by playing alone. Sean indicated he takes care of his cat and her four kittens, though two died and he buried them without any parental assistance. He indicated he is usually alone much of the time because his father is always working on the computer, though he and his father go out at night to the baseball field to pick up cans. Sean stated he can cook and he makes his own breakfast. He indicated there are no rules at home, indicating he does his "own thing" because his father will allow it. Sean stated he usually goes to bed around 11:00 p.m. or midnight during the school year, but when his mother lived home, he would have to go to bed at 9:00 p.m., which he did not like. He stated he is never tired and has trouble sleeping through the night, though he did not know why. He reported that he does many household chores otherwise things will not get done. While visiting Sean at his father's home, he was on the trampoline alone and stated he can go on it anytime without supervision. He also left the yard several times on his bicycle without asking permission and his father never cautioned him or questioned his whereabouts. Also, upon this evaluator leaving the CT Page 9533 premise, Sean chased the car down the road on his bicycle.
Due to the allegations Mr. Nocera made with regard to Ms. Hebert's physical abuse toward Sean, this evaluator asked Sean how his parents react when he does something wrong. Sean stated his father never grounds him, but he does get mad and yells and swears a lot when his mother is present. When with his mother, he stated she grounds him and makes him go to his room, which he does not like. At the time this evaluator visited Sean at his father's house, he had chose not to see his mother, though he did not know why, other than he wanted to take his bicycle back to his father's house because his father told him he should be able to do so. While at the same time, he sat for several minutes on his bed and showed this evaluator the numerous items his mother had given him as gifts, as well as the fun time he has when he does visit with her. Though when he spoke in front of his father, after hearing his father's derogatory comments about Ms. Hebert, the child became confused, stating he does not want to visit his mother. According to Sean, he is happier with his father for the reason that he can do whatever he wants to, and there are no daily structure and/or safety boundaries.
Sean has been promoted to the fourth grade at Regan Elementary School in Waterbury, Connecticut. The principal, Ms. Frageau was interviewed, stating she had interacted with both parents. She indicated they showed love and concern for the child until last year and then it became a "war zone." She was aware of the many problems the family presented. Ms. Frageau reported Ms. Hebert came to the school to visit Sean, and when Mr. Nocera heard about it, the parents engaged into a verbal and physical altercation in front of her and the child. Both parents were escorted out of the building. She stated Mr. Nocera loves to play mind games with the child, by pulling him into adult conversations. Ms. Frageau stated both parents attended the Connecticut Mastery Test rally and sat at opposite ends of the gymnasium. She witnessed Mr. Nocera and the child together.
Ms. Frageau indicated Sean is manipulative in his environment most of the time. She believes he may have some emotional problems, has few friends at school, and limited social skills. Lastly, she stated Ms. Hebert is a nice lady, though she tends to get upset easily; and Mr. Nocera has always shown respect to her, though she feels he can be a precarious individual.
Mr. Kevin Mitchell, third grade teacher at Regan Elementary School was interviewed. He indicated his awareness of the family problems for which Mr. Nocera blamed on Sean's mother. Mr. Nocera alleged mother was hitting the child, and Mr. Mitchell reported it to the school psychologist, though he never noticed any marks on him, nor did Sean ever tell the teacher that his mother was hitting him when questioned by the school CT Page 9534 authorities. He reported Sean began having difficulty during the second marking period, "he just was not there." Sean told Mr. Mitchell that he would stay up too late at night and had trouble sleeping and eating. Mr. Mitchell acknowledged Sean was always tired in class. The records reflected eight unexcused absences for the year of which six where during the third marking period, while Sean was living with his father. Mr. Mitchell indicated that his father did not send in notices of the child's absences, nor did he contact the school. According to Mr. Mitchell, both parents attended a PPT meeting, at which time a verbal argument erupted between the parents and mother decided to leave the meeting. Additionally, Mr. Mitchell's assessment of Sean is similar to Ms. Frageau's, in that he has difficulty making friends, lacks social skills, and isolates himself from others.
Ms. Louise Mancini, school psychologist for Regan School was contacted by telephone and followed up with a letter. She indicated she has met both parents at the PPT meetings as far back as prekindergarten. Ms. Mancini stated there has been a significant increase in tension between the parents who were once cooperative and easier to speak to. Over the past year, both parents have been argumentative and confrontational with each other in her presence. She stated father blamed mother for the child's problems. Ms. Mancini stated the child has never spoken negatively of his mother or father. Ms. Mancini stated she was unaware of any physical abuse by the parents. She believed the child had experienced emotional abuse and had suggested family counseling.
According to Ms. Smith, Sean's fourth grade teacher, Sean has show major improvement in his scholastic attitude in that he is being more cooperative and less disruptive in class. She stated he is having some trouble with completing his classroom assignments, and at times appears to be daydreaming. Although Ms. Smith is unable to credit either parent, she feels Sean is receiving help on his homework assignments. Ms. Smith stated Ms. Hebert has been in contact with her, showing great concern for her son and inquired about his need for school supplies and attending the open house. Ms. Smith indicated she was in contact with Mr. Nocera, who was cooperative with helping Sean deal with the problems he was having, though she indicated he would have adult discussions with her in the presence of the child, which was a concern to her. Hygiene, absenteeism, and tardiness are not a problem according to Ms. Smith.
Ms. Hebert presents as a caring and loving parent, though anxious at times, who is desperately trying to salvage the damaged relationship with her child. It appears to this evaluator, when she is confronted by situations displeasing to her, she tends to get verbally aggressive and/or walks out. She stated she reacts in this manner because she is tired of Mr. Nocera continually blaming her for the family problems. Ms. CT Page 9535 Hebert indicated on several occasions she has always been there for Sean, and was not only the primary care taker, but also the financial provider as well. She managed to juggle her outside work and family life to the best of her ability. Ms. Hebert realized she was no longer in love with Mr. Nocera and made a decision to end the relationship, though they agreed to continue to reside together until the house was sold. According to Ms. Hebert, she was still living with the family until March 2000. At that time, she was forced out of the house. Ms. Hebert indicated she did not abandon Sean and wanted him to finish the year at the same school. She stated Mr. Nocera has never accepted the fact that she moved on and he no longer has control over her.
Ms. Hebert affirmed she has never physically harmed her child as father has alleged. She stated her form of discipline with the child is grounding him or time outs. Her wishes are to rekindle the relationship she once had with her child. According to Ms. Hebert, she has concerns regarding Sean's hygiene when with his father. She indicated on several occasions, when she has picked him up for a visit, Sean is dirty and not properly dressed. Ms. Hebert has confronted Mr. Nocera about this, but she stated his response was "take him home and give him a bath." She also stated he sends Sean to his mother's with no articles of clothing, only what he is dressed in. Ms. Hebert indicated she provides all the transportation for visitation. According to her, upon her arrival Sean will either argue with her that he is not going or he will go into the house to inform his father that he is leaving with his mother.
References indicated Ms. Hebert is a warm, loving mother to her child, very work conscientious and tries very hard to teach her son morals and values. During the home visit, mother and son sat on her bed together with this evaluator present, and they interacted in a positive manner, talking about the events of Sean's day. On the other hand, it was obvious to this evaluator, that Ms. Hebert tried very hard to set limits and boundaries with Sean, though he would not listen to her directives. Several times she told him not to go any further than the end of the road on his bicycle, but he would not obey her and left the area as she went to find him. She also told him to change his socks, which were soaking wet from his father's house, and he also refused to do so. It remains a concern to this evaluator, that Sean shows a lack of respect towards his mother, who attempts to set limits and boundaries for his safety and appropriate development.
Mr. Nocera presents as a concerned and loving parent, who may be having a difficult time ending his relationship with Ms. Hebert. During the interviews, Mr. Nocera was quite anxious and had difficulty staying focused. He tended to put forth more energy into blaming Ms. Hebert for her parenting style. According to Mr. Nocera, he has always been the CT Page 9536 primary provider and assumed responsibility for the household functions. At times when Ms. Hebert was detained while working second shift, he would have to take the child to work with him at 11:00 p.m. Mr. Nocera indicated mother rarely spent anytime with the family, and when she did, an argument would erupt and she would walk out on both of them. It is Mr. Nocera's belief, that mother's behavior has had a negative effect on Sean.
Mr. Nocera has a difficult time with structure and rules for his child. He stated he does not plan meals and could not tell this evaluator when his son started school, stating "it's a guy thing." He stated since Ms. Hebert left the home, he has not asked for child support and never put forth the motions into court for custody or child support issues because in doing so would only cause more emotional harm to the child. While visiting Mr. Nocera and Sean, he did not answer the doorbell and Sean let this evaluator into the house. Mr. Nocera was on the computer day trading. Mr. Nocera took several minutes to explain his work to this evaluator, while Sean was elsewhere. upon leaving the family dwelling, Mr. Nocera spoke negatively of Ms. Hebert, instructing Sean to tell this evaluator how he does not want to visit his mother.
Mr. Nocera called this office on several occasions to discuss problems that had arisen in the home. During these conversations, this evaluator could hear Sean nearby the telephone. Mr. Nocera continued his conversation, asking this evaluator to speak to his son about the problems. When discussing these incidents with Mr. Nocera, he justified his behavior, stating the conversations are not directed toward Sean, even though he may be in the same room. Instead, he blamed Ms. Hebert for having direct frequent adult conversations with Sean.
Mr. Nocera has made allegations that mother physically abuses the child. He stated he has told several agencies of the abuse and no one has helped him with his complaints. He told this evaluator he has contacted the Governor in writing and is demanding an answer from the State of Connecticut to protect his child. When questioned about the alleged physical abuse, Mr. Nocera stated he observed bruises on Sean and Ms. Hebert is responsible for them. He then indicated that Sean told him his mother had hit him in the face. Mr. Nocera avowed he has never seen Ms. Hebert physically abuse the child. Additionally, he alleges when mother has come to pick up Sean, at times, she has taken him without telling Mr. Nocera, which concerns him because he does not know where Sean is.
Mr. Joseph Futschik, Executive Director, of the Family Intervention Center was contacted. According to Mr. Futschik, he met with Mr. Nocera and Sean on two occasions, and also with Ms. Hebert on two occasions. On October 24, 2000, Mr. Futschik met with both parents, while Sean was in CT Page 9537 the waiting area. The focus of the session was to open up the lines of communication between the parents. Mr. Futschik stated that Ms. Hebert cooperated fully and is very interested in having a relationship with her son. Within minutes of the conjoint session, father was asked if he was interested in communicating with mother for Sean's best interest. According to Mr. Futschik, Mr. Nocera answered negatively and became quite volatile and abusive with his language, which is a violation of the therapy guidelines. Mr. Futschik ended the session immediately. Mr. Nocera continued with the derogatory comments in front of the child, having the child agree with him about Ms. Hebert being a bad person. He was then asked to leave again. The observations by Mr. Futschik on several occasions with Mr. Nocera, were his verbal attacks directed to Ms. Hebert in Sean's presence, sometimes with foul language. He believes that father's behavior is vindictive and cruel. Mr. Nocera stated in the presence of this therapist and Sean, that he "wants her dead." It is Mr. Futschik's belief that Sean is being used as a pawn without consideration of his well being. Neither parent has scheduled any additional counseling sessions, though Ms. Hebert is concerned father will not continue Sean in counseling.
CONCLUSION AND RECOMMENDATIONS
This matter involves a nine-year old child who has resided with his father since the couple separated in March 2000. The couple was never married and they have cohabited for approximately twelve years. Ms. Hebert is requesting joint legal custody and primary physical residence. Mr. Nocera is requesting sole legal custody and primary physical residence.
There has been a significant increase in conflict between the adults over the past year. Mr. Hebert's and Ms. Nocera's approach to parenting is very different. It appears that they have let the conflict between them become an obstacle in their ability to properly care for their son. Sean is experiencing hostility toward his mother, due to the adult conversations he is engaging in with his father. Sean has also witnessed these conversations in person and on the telephone, between Mr. Nocera and this evaluator, as well as other outside professionals. Despite the court orders, the parents have continued to engage in adult conversations in his presence. The child mirrors his father's point of view and chooses sides. The police have been contacted on numerous occasions and summoned to father's house when Ms. Hebert was unable to visit with her son. The child has witnessed the police presence on each occasion. He has also witnessed the verbal conflict of his parents in the presence of the police.
It appears Sean is ambivalent about his place within this family unit and CT Page 9538 uncertain in his environment. Sean has already been put in the unfortunate position of having to choose a parent and having to choose which parent he will be most loyal to. The anger and confusion he is experiencing is understandable, due to the situation he is experiencing with his parents' separation and their continued conflict.
Mr. Nocera brought forward allegations of suspected physical abuse toward the child by Ms. Hebert. After a thorough evaluation, these allegations appear unsubstantiated. It has been substantiated that both parents are equally responsible for the emotional abuse of this child, in that they are unable to cooperatively co-parent and put Sean's needs first. Also, they are having problems controlling their impulsive and angry behavior in the child's presence, which in turn has resulted with Sean's negative behavior and lack of control. DCF has substantiated emotional abuse by both parents and physical neglect by father toward Sean.
Ms. Hebert has made improvements in rebuilding her relationship with Sean. She has a proposed parenting plan and is clear in her role as a parent. Her goals and expectations regarding Sean are also clear and she wishes for him to live in a healthy structured environment. Ms. Hebert believes in order to do this, feelings must be set aside while tasks and responsibilities of co-parents are tended to. It appears she is the parent, who facilitates and continues the relationship between Sean and his father and will cooperate with the visitation schedule. It appears she has attempted to set boundaries and limits, and she expects the child to operate within in them; though Sean has difficulty obeying his mother's directives and shows her a lack of respect.
Mr. Nocera's approach to parenting is very much different from mothers. Though he has a strong bond with Sean, he seems to have loose boundaries between him and the child. It appears that Sean has incorporated the behavior that his father relates to his mother. While Mr. Nocera is responsive to Sean's expressed concerns, he seems unable to set up and support limits even in dangerous situations, such as leaving the child unattended late in the evening at home. It appears Mr. Nocera is not able to provide a safe environment for Sean. He has not been able to support a positive relationship between Sean and his mother, and therefore, Sean is unable to relate to his mother in a way that he must, in order to feel safe, stable, and content in her care.
Mr. Nocera has not resolved his own issues regarding mother. It appears he lacks insight with the emotional tension that has risen inside of him and has shown a lack of interest to address these issues. His own feelings about mother are negative and intense. It is unlikely that they will dissipate. He states and believes that mother is responsible for all of the family problems. Mr. Nocera does not accept any responsibility for CT Page 9539 the problems in the family. This perception makes it difficult for him to change any of the behaviors that he and Sean now have that might cause or contribute to their problems. He has not been able to view therapy as a resource because of his belief that it does not help the situation and is not really needed, but instead, court ordered. This precludes the possibility of using therapy as a help or support.
This evaluator remains concerned with the fact that both parents have stated they will never be in agreement to a co-parenting arrangement, that the conflict between them continues to increase, and the effect their behavior has on Sean. The parents' behavior is unhealthy, and no matter what their issues are, both Ms. Hebert and Mr. Nocera are the only parents he will ever have and he needs them both. Thus to enhance the relationship between Ms. Hebert and Sean, this evaluator believes it is imperative that both parents need to address the impact their behavior has on Sean. There needs to be an opportunity to help resolve the issues in this situation and to reduce everyone's source of tension.
Mr. Nocera has limited ability to control his temper. He lacks the ability to provide the appropriate boundaries at this time. His limited insight has Sean living in an environment where his relationship with his mother is continually undermined. Therefore, it appears a change of residence would be in Sean's best interest. Adjustment to an environment in which there are limits and expectations will be difficult for both Sean and his mother. Sean and his mother will need to be regularly involved in a therapeutic setting to adapt to these changes.
Both parents have stated they both want what is best for their son. It would be in the child's best interest if the parents put an end to each other's blaming and move forward in a positive direction in raising Sean. The parents need to work with a therapist who has the expertise with working with high conflict families. They need to develop a certain amount of trust in each other and have a place to discuss issues regarding the safety for the Child and the disagreements that arise.
Therefore, it is the recommendation of the Family Services Unit as follows:
 1. Both parents share a joint custodial arrangement for the child.
2. Primary physical residence should be with the mother.
 3. Father should have reasonable rights of visitation with the child every other weekend from Friday 3:30 p.m., where father should pickup the child after school until Sunday 7:30 p.m., where mother CT Page 9540 should pickup the child at father's house.
 4. Father should have reasonable rights of visitation with the child, every Tuesday and Thursday from 3:30 p.m., where father should pickup the child after school and mother should pickup the child at father's house at 7:30 p.m.
 5. Both parents advise and consult each other regarding the major developmental and elective decisions concerning the child's medical, education, and religion, etc. If the parents are unable to reach an agreement, then mother should make the final decision.
 6. The holidays should be alternated yearly with Christmas Eve, 12/24/00 beginning with father and Christmas Day, 12/25/00 beginning with mother.
 7. Both parents should have two weeks of uninterrupted vacation with the child during the summer months.
 8. Mother's Day and Father's Day should be spent with the respective parent.
 9. The family should continue with family counseling on a regular schedule so as to monitor their adjustment to the situation.
 10. Both parents should be involved in parenting education classes.
 11. The child should not be relocated from the state by either parent without ninety (90) day prior notice to the court.
Respectively submitted,
Naomi Marinaro Family Relations Counselor